UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
DOUGLAS SURPRENANT,             )
                                )
         Plaintiff,             )
                                )
v.                              )      Civil No. 12-10019-PBS
                                )
PNC MORTGAGE,                   )
                                )
         Defendant.             )
_____)
```

REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

November 20, 2013

SOROKIN, C.M.J.

This case arises from a familiar scenario: a homeowner's efforts to obtain a loan modification after defaulting on his mortgage payments.  Although he ultimately was granted a modification and remains in his home today, plaintiff Douglas Surprenant challenges the defendant's handling of his various applications for loan modifications over the course of several years.  Pending is a motion filed by the defendant, PNC Mortgage ("PNC"), seeking entry of summary judgment with respect to each of the four claims asserted in Surprenant's complaint. Doc. No. 45.  Surprenant has opposed the motion, Doc. No. 65, which has been referred to the undersigned for a report and recommendation, Doc. No. 9.  For the reasons that follow, I recommend the motion be ALLOWED in part and DENIED in part.

I.   BACKGROUND

     A.   Motion to Strike

When he originally opposed PNC's motion, Surprenant, an attorney proceeding here pro

se, failed to comply with relevant Local Rules governing summary judgment proceedings.  <u>See</u> Doc. No. 62.  At PNC's request, the Court struck Surprenant's original responsive submissions and directed him to amend his papers in accordance with the Local Rules.  <u>Id.</u>  As instructed, Surprenant revised his brief, his exhibits, and his response to PNC's statement of undisputed facts.  <u>See</u> Doc. Nos. 65, 66, 73.  PNC, however, suggests Surprenant's amended submissions violate both the Local Rules and the Court's prior order, and once again has moved to strike portions of Surprenant's response to PNC's Local Rule 56.1 statement.  Doc. No. 76.

This time, PNC's motion (Doc. No. 76) is DENIED.  Surprenant's revised submission provides paragraph-by-paragraph responses to each of PNC's factual statements, consistent with the Court's instructions.  <u>See</u> Doc. No. 66.  In some instances, Surprenant offers explanatory facts along with a statement that a particular fact is either admitted or disputed, but he does so reasonably and with citations to record evidence.  <u>E.g.</u>, <u>id.</u> at ¶ 26.  And, as permitted by the Court's prior order (as well as by the Local Rules), Surprenant has supplemented his response with a list of additional disputed facts which he suggests are material to his claims and warrant a trial.[1]  Accordingly, his revised submission is compliant with both the Local Rules and the Court's directives and, as such, there is no basis for striking it.[2]

---

[1]PNC argues Surprenant improperly has offered his own list of **undisputed** facts, presumably overlooking the heading that precedes Surprenant's additional factual statements: "Plaintiff's Other **Disputed** Material Facts."  Doc. No. 66 at 16 (emphasis added).

[2]This is not to say that the Court will embrace any or all of Surprenant's explanatory facts or his statement of disputed facts without considering them against the record evidence and independently determining whether they are supported therein.

B.      Material Facts[3]

Surprenant purchased his home at 63 Cedarhill Road in Holbrook, Massachusetts on July 3, 2007 for $394,000. Doc. No. 66 at ¶¶ 1-2, 58. In connection with the purchase, he obtained a loan for $315,200 secured by a mortgage on the home. Id. The terms of the mortgage provided for a fixed 7.5% interest rate over a term of thirty years, with monthly payments of $2,203.92. Id. at ¶¶ 5-6. Both the note and the mortgage eventually were assigned to PNC. Id. at ¶ 4; Doc. No. 48-29.

Around March 2008, Surprenant fell behind on his mortgage payments.[4] Doc. No. 66 at ¶ 11. He filed for bankruptcy on May 5, 2009 and subsequently requested information from PNC regarding options for modifying his loan. Id. at ¶¶ 12-13. From May 2009 through October 2009, Surprenant made regular payments toward his mortgage and his arrears through his Chapter 13 bankruptcy plan. Id. at ¶ 62. In September 2009, PNC sent Surprenant information about how to apply for the Making Home Affordable Modification Program ("HAMP").[5] Id. at ¶ 13; see Doc. No. 48-5. One of the letters from PNC outlining the information needed to process a HAMP application explained that any Trial Period Plan ("TPP") or permanent modification under HAMP would require bankruptcy court approval before

_____

[3]The following facts include: those which are not in dispute; those which are contained in documentary evidence, such as letters from PNC to Surprenant and PNC's internal logs related to Surprenant's loan; and those which are disputed, considered in the light most favorable to Surprenant.

[4]This apparently occurred after Surprenant split with his girlfriend, she moved out of the home, and she ceased contributing to the monthly payments. See Doc. No. 48-3 at 3.

[5]For background information on HAMP, see Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 228-29 (1st Cir. 2013).

becoming effective.  See Doc. No. 73-6 at 2.[6]

In November 2009, a PNC representative informed Surprenant during a telephone call that he did "not qualify for HAMP at [that] time due to [pending] bankruptcy."  Doc. No. 73-5 at 3.  In response, Surprenant ceased making mortgage payments and did not oppose PNC's request for relief from the bankruptcy court's automatic stay.  Id. at ¶ 67.  He also wrote to PNC requesting reconsideration, Doc. No. 73-8, but on February 15, 2010, PNC responded with a letter stating: "We are unable to offer you a Home Affordable Modification because [your mortgage] is [in] Active Bankruptcy," Doc. No. 48-6.  Along with that letter, PNC sent information on other modification options and a "Workout Package."  Id.

A few days later, the bankruptcy court granted PNC relief from the automatic stay, removing Surprenant's mortgage from the active bankruptcy proceedings.  Doc. No. 66 at ¶¶ 15, 75-76.  At the same time, PNC acknowledged receipt of "a partial workout package" from Surprenant and wrote to him requesting additional documents.  Id. at ¶ 16.  Later in February 2010, Surprenant spoke with a PNC representative named "Tabatha" about his pending request that his loan be modified.  Id. at ¶ 53.  Although she did not promise him a modification, she asked him whether he would consider a new thirty-year term at an interest rate between 4.5 and 4.875%, with monthly payments between $1,621 and $1,693 if, in fact, he qualified and was approved for such a modification.  See id. at ¶¶ 54-57, 78.  Surprenant told her he would accept such terms.  See id. at ¶ 78.

In March 2010, Surprenant sent PNC a payment of $2,723.91 "to show good faith."  Id.

---

[6]Page cites are to the numbers included in the ECF stamp at the top of documents appearing on the docket.

at ¶ 80.  Upon receiving the payment, a PNC representative instructed Surprenant not to make further payments "unless [he] ha[d] a payment arrangement."  Id. at ¶ 81.  Later that month, PNC wrote to Surprenant requesting updated financial information in connection with his modification application.  Id. at ¶ 17.  One of the financial documents Surprenant submitted was a "profit and loss" statement ("P&L") he created reflecting his law practice's total income and expenses for the first quarter of 2010.  Doc. No. 75-25.  In early April 2010, Surprenant explained to a PNC representative during a telephone call that he paid himself a salary out of his law practice twice each month, and that those payments were reflected on the P&L next to the entry for expenses designated as "Salary."  Doc. No. 73-17 at 25; see Doc. No. 75-25 (showing $16,200 paid in salary between January 1 and March 30, 2010, or $5,400 each month).  Surprenant also informed the representative that he accounted for his income taxes on the P&L next to the entry for "Payroll Taxes."  Doc. No. 73-17 at 25; see Doc. No. 75-25 (noting $2,700 paid in taxes for the first quarter of 2010).  The bottom of the P&L reflected "Net Income" for Surprenant's law practice of $2,879.72 for the first quarter of 2010.[7]  Doc. No. 75-25.

A title search conducted in April 2010 at PNC's request revealed tax liens on Surprenant's home.  Doc. No. 66 at ¶ 85; Doc. No. 73-22 at 4; see Doc. No. 73-17 at 23 (showing title ordered on April 8, 2010 and report returned by April 21, 2010); see also id. at 25 (reflecting Surprenant informed a PNC representative on March 26, 2010 that he owed back taxes).  There is no indication in the record that PNC informed Surprenant in April 2010 that

_____

[7]Considering Surprenant's explanation of his salary, it appears as though a straightforward calculation of his total monthly income from his law practice would require adding the amount listed next to "Salary" on the P&L to the "Net Income" reflected at the bottom, then dividing that total by the number of months encompassed by the P&L.

such liens would present obstacles to his modification application.  Later that month, Tabatha

contacted Surprenant to ask whether the modification terms they previously had discussed were

still acceptable; he agreed that they were.  Doc. No. 66 at ¶¶ 55, 86-88.  He understood this

conversation to mean that final review and approval of a modification under those terms was

imminent.  See id. at ¶ 89.  Soon thereafter, when Surprenant's file and the proposed

modification terms were submitted to a Freddie Mac representative for approval,[8] that

representative advised PNC (and then PNC advised Surprenant) that Surprenant should apply for

relief pursuant to HAMP.[9]  Doc. No. 66 at ¶ 95; Doc. No. 73-17 at 23.

Surprenant promptly submitted a HAMP application.  See Doc. No. 66 at ¶ 112; Doc. No.

73-17 at 23; Doc. No. 73-24.  On May 26, 2010, PNC wrote to request additional documents,

including Surprenant's tax returns.  Doc. No. 66 at ¶ 18.  About a month later, PNC sent

Surprenant a letter explaining he did not qualify for HAMP based on "excessive forbearance,"

i.e., inability "to create an affordable payment equal to 31% of [his] monthly gross income

without changing the terms of [his] loan beyond the requirements of the program."  Doc. No. 48-

10; see Doc. No. 66 at ¶ 19.  This determination apparently was based, at least in part, on PNC's

calculation of Surprenant's monthly income using the "net income" reflected on the P&L, and

without including the bimonthly "salary" Surprenant previously explained he paid himself.  See

73-17 at 22.  The HAMP denial letter informed Surprenant that "other options" might be

possible and instructed him to submit further information.  Doc. No. 48-10.

---

[8]Freddie Mac was the investor associated with Surprenant's loan.

[9]This apparently was recommended because, by that time, Surprenant's mortgage no
longer was part of his bankruptcy proceedings.  See Doc. No. 73-17 at 23.

Once again, Surprenant provided the requested documentation.  <u>See</u> Doc. No. 73-17 at 22 (listing information received on July 3, 2010); Doc. No. 73-18 (suggesting Surprenant faxed copies and/or additional information to PNC on July 7, 2010).  PNC wrote requesting additional information on September 16, 2010, Doc. No. 66 at ¶ 21, which Surprenant submitted, Doc. No. 73-17 at 21.  On October 15, 2010, PNC sent Surprenant a letter stating he did not qualify for a loan modification due to "a deficit of income," Doc. No. 48-13; <u>see</u> Doc. No. 66 at ¶ 22, based on calculations which again omitted Surprenant's bimonthly salary, Doc. No. 73-17 at 20 (using the "net profit" of Surprenant's law practice to arrive at a monthly income of $1,339.93).

Surprenant reapplied for a modification, Doc. No. 73-17 at 20, this time faxing an expanded P&L which incorporated an explicit description of his bimonthly salary payments to himself, along with a list of dates, amounts, and check numbers for each such payment through the first three quarters of 2010, Doc. No. 73-28.  After Surprenant provided additional information requested by PNC, the bank again concluded that he did not qualify for a modification due to insufficient income.  <u>See</u> Doc. No. 66 at ¶¶ 23-24; Doc. No. 73-17 at 19. The bank notified Surprenant of its determination via telephone call and letter dated November 22, 2010.  Doc. No. 66 at ¶ 24; Doc. No. 73-17 at 18.  For a third time, PNC's calculation of Surprenant's monthly income did not account for his bimonthly salary, despite the addendum to his P&L detailing those payments.  <u>See</u> Doc. No. 73-17 at 18-19 (calculating monthly income from his law office as $2,265.97).

Once more, Surprenant promptly reapplied for a modification.  Doc. No. 73-17 at 18. This time, Surprenant followed his application with a November 29, 2010 telephone call, during which he reminded PNC of his twice-monthly salary.  <u>Id.</u> at 17.  Surprenant provided additional

financial information in December 2010, and explained (for at least the fourth time) in January 2011 the manner in which he paid himself a salary from his law practice.  Id.  In February 2011, PNC requested updated financial information, which Surprenant supplied.  Doc. No. 66 at ¶ 25; Doc. No. 73-17 at 16.  Surprenant's application was denied on March 11, 2011 after PNC calculated Surprenant's gross monthly income as $7,743.86, but then deducted estimated taxes and concluded his net income was insufficient in light of his monthly expenses.  Doc. No. 66 at ¶ 26; Doc. No. 73-17 at 15-16.  According to Surprenant, he attempted to call PNC upon learning of the denial to remind them that, as reflected on his P&L and as he had told them by telephone once before, he had accounted for his taxes by deducting them throughout the year, but PNC informed him his file already was closed.[10]  Doc. No. 66 at ¶ 26(e); see Doc. No. 73-17 at 25 (noting Surprenant's April 2010 explanation of his tax withholdings); Doc. No. 73-28 (listing "payroll taxes" as an expense).

Within a week, Surprenant submitted what appears to have been at least his sixth application for a loan modification.  Doc. No. 73-17 at 15.  A familiar chain of events ensued, with PNC requesting and Surprenant supplying additional information.  Doc. No. 66 at ¶ 27; Doc. No. 73-17 at 14.  This time, although it appears PNC appropriately calculated Surprenant's income and acknowledged his tax withholdings, it nonetheless denied Surprenant's application on April 27, 2011.  Doc. No. 66 at ¶ 28.  The denial came after a title search, which reflected

---

[10]Additionally, PNC's corporate representative suggested during her deposition that loan modification assessments were properly made based on an applicant's gross income, not net income.  See Doc. No. 73-4 at 29, 36.

Surprenant's state tax liens.[11]  Doc. No. 73-17 at 12-13.  PNC informed Surprenant he would "need to clear title first and submit proof of satisfaction of [the] lien[s] and may be able to reapply then."  Id. at 12.

Two days after the denial, Surprenant reapplied.  Id.  PNC requested a copy of Surprenant's 2010 tax return, which he promptly produced.  Doc. No. 66 at ¶ 30; Doc. No. 48-20; Doc. No. 73-17 at 12.  In May 2011, Surprenant informed PNC that he was in the process of resolving his tax liens in the context of his pending bankruptcy, and he asked whether he could use funds he had saved as a contribution toward the arrears on his mortgage; PNC instructed him to use the money to dispose of his tax liens.  Doc. No. 73-17 at 12.  Surprenant complied.  He voluntarily dismissed his bankruptcy petition, paid his back taxes, and faxed PNC notice that his liens had been satisfied in June 2011.  Doc. No. 48-4 at 13; Doc. No. 66 at ¶ 29; see Doc. No. 73-17 at 11.  From the time of that fax through August 18, 2011, Surprenant called PNC approximately fifteen times seeking status updates regarding his application and asking to speak with the person responsible for reviewing it.  Doc. No. 73-17 at 10-11.

On August 22, 2011, when PNC still had not made a decision regarding his application and he had not succeeded in speaking with the individual assigned to review it, Surprenant sent PNC a demand letter pursuant to Chapter 93A of the Massachusetts General Laws.  Doc. No. 73-10.  Four days later, PNC wrote to Surprenant thanking him "for [his] recent inquiry concerning [his] mortgage loan," noting "it may take some time to gather the information needed to

---

[11]The tax liens were part of Surprenant's Chapter 13 proceedings and, as noted above, had been revealed to PNC a year earlier by Surprenant as well as during a previous title search. Doc. No. 66 at ¶¶ 29(a), 85; Doc. No. 73-17 at 25; Doc. No. 73-22 at 4.

accurately respond," and promising further written contact in thirty days.[12]  Doc. No. 48-21.

PNC requested updated information from Surprenant related to his modification application on

September 16, 2011, Doc. No. 48-22, which he provided, see Doc. No. 48-24.  On September 20,

2011, PNC wrote again to "follow up [on Surprenant's] recent inquiry concerning [his] loan,"

stating its research into the inquiry was ongoing and promising "results by October 5, 2011."

Doc. No. 48-23.  PNC sought, and Surprenant supplied, further information related to the

pending modification application at the end of September 2011.  Doc. No. 66 at ¶ 36.

On October 3, 2011, PNC sent another "follow up" letter regarding Surprenant's "recent

inquiry," noting its ongoing research and promising a response by October 18, 2011.  Doc. No.

48-26.  PNC sent a response to Surprenant's Chapter 93A letter on October 5, 2011, in which it

outlined its view of the history of Surprenant's modification requests, found "no indication of

unfair or deceptive practices involving [his] mortgage," and noted its review of Surprenant's file

for modification eligibility was ongoing.  Doc. No. 73-11.  The letter also indicated that loan

modifications for individuals in active bankruptcy can occur if the debtor has his mortgage

reaffirmed.  Id. at 4.  Around the same time, PNC determined Surprenant was ineligible for

HAMP because his monthly income was sufficient to permit him to make payments in the

amount required under the existing terms of his mortgage.  Doc. No. 66 at ¶ 38; see Doc. No. 73-

17 at 9 (including an October 4, 2011 note calculating monthly income of more than $9,000 and

concluding "loan is . . . already a fail," and an October 6, 2011 note rejecting modification

---

[12]Although the parties characterize this letter as one regarding Surprenant's application
for a loan modification, see Doc. No. 66 at ¶ 32, the timing seems to suggest it more likely was
sent in response to Surprenant's Chapter 93A letter.  This question does not impact the resolution
of the pending motion for summary judgment.

because "current payment [is] less than 31% of gross monthly income").[13]

Surprenant immediately pursued further review for "other [modification] options" by submitting information requested as part of a workout package, Doc. No. 48-26, and PNC acknowledged it had received his "request for hardship assistance" by October 10, 2011, Doc. No. 48-30; see Doc. No. 66 at ¶ 40.  On November 17, 2011, PNC informed Surprenant his request had been assigned to a new "contact representative," and shortly thereafter PNC requested updated financial information from Surprenant.  Doc. No. 66 at ¶¶ 41-43; see Docs. No. 48-31, 48-32, 48-33.  Two months later, on January 17, 2012, PNC approved Surprenant for a Trial Period Plan ("TPP"), pursuant to which Surprenant would be required to make three monthly payments of $2,667.60, beginning in March 2012.[14]  Doc. No. 48-35; Doc. No. 66 at ¶¶ 45-46.

The TPP provided that successful completion of its terms would result in a permanent loan modification being offered, although it did not contain information about what the terms of such a modification might be.  Doc. No. 48-35; see Doc. No. 66 at ¶ 47.  Surprenant was first notified of the TPP approval by phone, but did not receive a written copy of the TPP until January 30, 2012 – one day before he was required to sign and return it – and, according to Surprenant, that copy was at least partly illegible.  Doc. No. 66 at ¶ 45(a), (c).  While awaiting

---

[13]This time, PNC's calculations were based on the sum of Surprenant's reported income on his most recent P&L and the "officer wages" reported on his 2010 tax returns, a formula not applied when considering his prior applications.  Doc. No. 73-17 at 9; see Doc. No. 66 at ¶ 38(d); see generally Doc. No. 73-17.

[14]It appears Surprenant sent a "Qualified Written Request" to PNC in December 2011, although no copy of that request or any response thereto appears in the record.  See Doc. No. 73-2 at 34; see also Doc. No. 48-34.

written confirmation of the TPP, Surprenant received notice that a foreclosure sale of his home had been scheduled for February 2012. Id. at ¶ 45(b). The sale never occurred, but was postponed by a month (and then stayed indefinitely) only after Surprenant resorted to litigation. Doc. No. 66 at ¶ 51.

After Surprenant made the payments required under the TPP, PNC offered him a permanent loan modification reducing his interest rate to 5% and extending the term of the loan by fifteen years. Id. at ¶¶ 48-50. Surprenant received the permanent modification paperwork on May 25, 2012 and was required to sign and return it by June 1, 2012. Id. at ¶ 48(b). Surprenant accepted the permanent modification. Doc. No. 66 at ¶ 48. The new principal due under the terms of the modification is $399,537.88; Surprenant's modified monthly payments are $1,926.56. Doc. No. 48-36 at 2. In September 2012, PNC received a $400 "investor incentive" payment for having modified Surprenant's loan; the same day, it received a third-party check in the amount of $58,700, which is logged in Surprenant's loan file, but which PNC's corporate representative was unable to explain. Doc. No. 66 at ¶¶ 97-100; Doc. No. 73-20 at 2.

A few additional facts bear mention. First, the parties dispute whether Surprenant always submitted the necessary paperwork to PNC on a timely basis. This dispute is not capable of resolution on the record as it now stands, but it is clear from the notes related to Surprenant's loan and summarized above that, at least in many instances, he did provide requested information promptly. Second, throughout the pendency of his repeated applications, Surprenant called PNC dozens of times to provide information or to check on the status of his loan. It appears as though certain PNC representatives did not always return his calls or contact him with information as promised. See, e.g., Doc. No. 73-17 at 10-11. Third, Surprenant is an attorney.

He has submitted evidence showing that one of his clients also had arrears on a mortgage held by

PNC, also had an active bankruptcy action in 2010, and was offered a permanent loan

modification by PNC (which the bankruptcy court approved) while her arrears were part of her

bankruptcy proceedings.[15]  See Doc. Nos. 73-12, 73-13, 73-14.  Finally, Surprenant has

submitted an expert report estimating that he has suffered more than $75,000 in damages as a

result of the alleged delay in PNC's offer to modify his loan.  See Doc. No. 73-39.

II.      LEGAL STANDARD

        Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the

burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his

pleading, but must set forth specific facts showing there is a genuine issue for trial."  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); accord Barbour v. Dynamics Research Corp.,

63 F.3d 32, 37 (1st Cir. 1995).  The Court is "obliged to view the record in the light most

favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving

party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the

Court must ignore "conclusory allegations, improbable inferences, and unsupported

------

        [15]Surprenant's client has authorized him to disclose the circumstances of her loan
modification.  See Doc. No. 73-13.  The parties dispute whether this client's circumstances were
comparable to Surprenant's – and, thus, whether facts regarding her modification are material
here.  This is a fact question that the Court cannot resolve at this time.  For present purposes, it is
sufficient to note that certain similarities are apparent from the record: both mortgages were
originated in 2007; the loans were for similar amounts ($302,400 and $315,200); both debtors
sought modifications in 2009 and 2010 while in bankruptcy; and Freddie Mac appears to be the
investor associated with both loans.  Compare Doc. No. 48-36 at 1-2, with Doc. No. 73-14 at 3.

speculation." <u>Sullivan v. City of Springfield</u>, 561 F.3d 7, 14 (1st Cir. 2009).

"There must be sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50. "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact." <u>Nat'l Amusements, Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995).  A material fact is one which has the "potential to affect the outcome of the suit under applicable law." <u>Nereida-Gonzalez v. Tirado-Delgado</u>, 990 F.2d 701, 703 (1st Cir. 1993).  For a factual dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." <u>Nat'l Amusements, Inc.</u>, 43 F.3d at 735 (internal citation omitted).

III.   <u>DISCUSSION</u>

    A.   <u>Predatory Lending and Implied Covenant Claims</u>

PNC seeks summary judgment with respect to each of Surprenant's four claims, including those alleging predatory lending in violation of Massachusetts law and breach of an implied covenant of good faith and fair dealing.  <u>See</u> Doc. No. 46 at 4-8.  In his response, Surprenant concedes that these two causes of action should be dismissed.  <u>See</u> Doc. No. 65 at 1. As such, no further discussion of these claims is necessary.  Summary judgment should enter in PNC's favor as to Counts I and II of the complaint.

    B.   <u>Promissory Estoppel</u>

PNC challenges the promissory estoppel claim alleged in Count III of the complaint,

arguing Surprenant cannot satisfy the elements of such a claim under Massachusetts law.  See Doc. No. 46 at 8-11.  Surprenant counters by asserting PNC "dangled the loan modification on a string so that [he] would remove his arrears from his bankruptcy thus subjecting his home to foreclosure," but later "revoked its offer" of a modification and caused Surprenant to "live under the cloud of foreclosure and the fear of losing his family home."  Doc. No. 65 at 7.  Setting aside the question of whether PNC's conduct was unfair or deceptive – a question central to the final claim in Surprenant's complaint, discussed below – Surprenant has not established that the circumstances presented here amount to "a sufficiently definite promise . . . made, relied upon, and then broken," as is necessary to support a promissory estoppel claim.  In re JPMorgan Chase Mortg. Modification Litig., 880 F. Supp. 2d 220, 240 (D. Mass. 2012).

In Massachusetts, a plaintiff must establish three elements to prevail on a claim of promissory estoppel: that "a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee"; that "the promise does induce such action or forbearance"; and that "injustice can be avoided only by enforcement of the promise."  Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197, 203 (1st Cir. 2004) (citations and internal quotations omitted).[16]  The first element requires a promise that is "interchangeable with an offer in the sense of commitment," such that the promisee is justified "in understanding that a commitment has been made" because "the promisor's expectation to be legally bound is clear."  Dixon, 798 F. Supp. 2d at 340 (citations

---

[16]Although Massachusetts courts do not embrace the term "promissory estoppel," they apply the doctrine using traditional contract principles, with detrimental reliance serving as a substitute for consideration.  See Dixon v. Wells Fargo Bank, N.A., 798 F. Supp. 2d 336, 340 (D. Mass. 2011) (discussing Loranger Constr. Corp. v. E.F. Hauserman Co., 384 N.E.2d 176 (Mass. 1978)).

and internal quotations omitted); <u>accord</u> <u>Braunstein v. McCabe</u>, 571 F.3d 108, 127 (1st Cir.

2009).  Moreover, the promise "must be sufficiently definite and certain in its [essential] terms to

be enforceable." <u>Dixon</u>, 798 F. Supp. 2d at 341 (internal quotations omitted).  Massachusetts

courts "are justifiably unwilling to endorse one party's aspirational view of the terms of an

unrealized agreement." <u>Id.</u>  However, "where the facts suggest that the promisor's words or

conduct were designed to take advantage of the promisee," courts may "enforce even an

indefinite promise made during preliminary negotiations." <u>Id.</u> at 344.

Surprenant relies on two "promises" by PNC in an effort to support his promissory

estoppel claim: 1) representations that he was not eligible for a loan modification while his

mortgage was part of his active bankruptcy; and 2) statements made by PNC's representative

Tabatha that, if he qualified, Surprenant might receive a loan modification involving a new

thirty-year term, an interest rate between 4.5 and 4.875%, and monthly payments between

$1,621 and $1,693. <u>See</u> Doc. No. 65 at 6, 8.  No reasonable factfinder could conclude that either

set of statements provides a basis for relief pursuant to the promissory estoppel doctrine.

The former representations fail to support a triable promissory estoppel claim for several

reasons.  First, explanations by PNC during a November 2009 telephone call and in a February

2010 letter that Surprenant was ineligible for HAMP due to his pending bankruptcy, <u>see</u> Doc.

Nos. 48-6, 73-5 at 3, are neither offers nor promises in any usual sense of those terms.  Such

statements conveyed policies or guidelines applicable to HAMP applications, whether accurately

or inaccurately, and cannot be construed as expressing commitments or intentions by PNC to be

legally bound.  Second, Surprenant has adduced no evidence (besides, perhaps, his own

speculation) suggesting that these comments were designed by PNC to "take advantage of" him.

16

Third, Surprenant has not alleged that any PNC representative assured him he would be considered for (or would qualify for) HAMP if he voluntarily removed his arrears from his bankruptcy proceedings, as he chose to do, or that anyone from PNC ever suggested that he do so.  Indeed, when informing Surprenant that he could not receive HAMP relief while his bankruptcy was pending, PNC went on to offer him an opportunity to pursue other "workout" or modification options available through PNC.  See Doc. No. 48-6.

Even if the statements about Surprenant's pending bankruptcy did, somehow, constitute a "promise" to consider him for HAMP after his mortgage was removed from his bankruptcy proceedings, and assuming that Surprenant's decision to remove his arrears from his bankruptcy proceedings was undertaken in reasonable reliance on that "promise," the facts demonstrate PNC kept its promise.  Upon learning the bankruptcy court had relieved PNC from the automatic stay, PNC considered Surprenant's various applications for relief pursuant to HAMP and PNC's other available workout programs.  To the extent that such consideration was plagued by allegedly unfair or deceptive conduct which delayed the offer of a permanent modification, Surprenant's recourse is through Chapter 93A, see Discussion § III(C), infra, not promissory estoppel.  See JPMorgan Chase, 880 F. Supp. 2d at 239-40.

Finally, notwithstanding the series of applications that were denied for reasons Surprenant challenges here, the fact remains that PNC did not foreclose because Surprenant ultimately qualified for, was offered, and accepted a permanent loan modification.  Under these circumstances, he has not shown detrimental reliance, or that injustice can be avoided only by sustaining his promissory estoppel claim.  See id. (concluding that plaintiffs who "eventually" received modifications, but who incurred increased principal balances and late fees as a result of

delay and "conduct [by the lender which] may have been deceptive and unfair," had "not shown

that a sufficiently definite promise was made, relied upon, and then broken").[17]

Surprenant's promissory estoppel theory fares no better insofar as it is grounded in

allegations related to his conversations with Tabatha.  Although Surprenant claims he "believed

the modification negotiation was over and he had been approved for a modification" after

Tabatha's April 2010 call to discuss proposed terms, Doc. No. 66 at ¶ 89, no reasonable person

in Surprenant's position could have construed the comments he attributes to Tabatha as an offer

or commitment by which PNC expected to be legally bound.  Even accepting Surprenant's

description of Tabatha's statements, certain key terms of the modification he claims was offered

were left indefinite.  For example, both the interest rate and the monthly payment amount were

posited as ranges, not finite terms, and the total principal was not cited.  See Doc. No. 66 at

¶¶ 78, 88.  Moreover, Surprenant acknowledged that he understood Tabatha was not authorized

to make a binding offer on behalf of PNC, and that the terms she proposed were dependent on

him being qualified and approved for such a modification.  See Doc. No. 48-3 at 21-22.

---

[17]Surprenant's circumstances are not analogous to those presented by the plaintiffs in
Dixon, upon which he relies.  There, the only facts before the Court, which was ruling on a
motion to dismiss, were those alleged in the complaint.  798 F. Supp. 2d at 338.  According to
the complaint, the following series of events were at issue:  the plaintiffs requested a loan
modification, the bank instructed them to stop making payments on their loan and to submit
financial information to be considered in connection with a modification, the plaintiffs complied
and stopped making payments, and the bank initiated foreclosure proceedings without ever
having considered the modification application.  Id. at 339.  The Court in Dixon concluded that
the plaintiffs had stated a promissory estoppel claim by alleging that the bank had induced their
default through its broken promise to consider them for a loan modification if they took certain
steps; in other words, the bank promised to negotiate in good faith, then did not negotiate at all.
Id. at 348.  Here, the record as developed at this stage in the litigation establishes that Surprenant
already was in arrears on his mortgage (and in active bankruptcy) when he first approached PNC
about a modification, and that PNC did consider (and, ultimately, approve) his applications for a
modification after he removed his arrears from his bankruptcy proceedings.

Surprenant has not adduced evidence suggesting he did qualify, or should have qualified, for a loan modification on terms such as those described by Tabatha (as opposed to those he ultimately accepted).

Additionally, even if Tabatha's statements were construed as a promise or offer by PNC, it is unclear precisely how Surprenant claims he relied on those statements.  His decisions to remove his arrears from his bankruptcy proceedings and cease making payments occurred after he was told the bankruptcy action rendered him ineligible for HAMP, but before either of his conversations with Tabatha.  Surprenant has identified no actions he took after, and in reliance on, Tabatha's discussions with him about possible modification terms.  See Doc. No. 65 at 9-10. Indeed, the record before the Court reflects that Surprenant merely continued requesting a modification, providing financial information, and awaiting resolution of his applications.  Such conduct does not constitute the sort of "action or forbearance" that can support a promissory estoppel claim.  Furthermore, as stated above, there is no basis for finding that any emotional distress or economic damages claimed by Surprenant constitute detriments resulting from reliance on a promise allegedly conveyed by Tabatha in February or April 2010 (as opposed to harm flowing from PNC's allegedly unfair or deceptive conduct throughout the modification process, discussed further below).

Because Surprenant has not adduced evidence from which a reasonable factfinder could conclude he has established each of the elements of a promissory estoppel claim, PNC is entitled to summary judgment with respect to Count III of the complaint.

C.     Chapter 93A

Finally, PNC seeks summary judgment on Count IV of Surprenant's complaint, claiming

he "cannot prove that [PNC] engaged in any unfair or deceptive act" prohibited by Chapter 93A.

Doc. No. 46 at 11.  Surprenant counters by characterizing PNC's actions here as "extraordinary,"

arguing he has raised genuine factual disputes as to whether PNC wrongly refused to modify his

loan while his bankruptcy action was pending, improperly revoked an initial modification offer

in order to pursue government incentives available through HAMP, repeatedly failed to follow

its own procedures in determining Surprenant's eligibility for a loan modification, and

unnecessarily delayed the modification process resulting in an increased principal balance owed

on his mortgage.[18]  Doc. No. 65 at 12.  Careful consideration of the record and the parties'

arguments reveals that PNC has not established entitlement to judgment as a matter of law on

Surprenant's Chapter 93A claim.

Chapter 93A "provides a cause of action for a plaintiff who 'has been injured,' by 'unfair

or deceptive acts or practices.'"  Rule v. Fort Dodge Animal Health, Inc., 607 F.3d 250, 253 (1st

Cir. 2010) (quoting Mass. Gen. Laws ch. 93A, §§ 2(a), 9(1)).  "A practice is unfair if it is within

the penumbra of some common-law, statutory, or other established concept of unfairness; is

immoral, unethical, oppressive, or unscrupulous; and causes substantial injury."  Linkage Corp.

v. Trs. of Bos. Univ., 679 N.E.2d 191, 209 (Mass. 1997) (citation, internal quotations, and

modifications omitted).  "Conduct is 'deceptive' when it has 'the capacity to mislead consumers,

---

[18]Surprenant does not rest his Chapter 93A claim on conduct by PNC during the loan
origination process, instead limiting it to events occurring after his default, during the loan
modification process.  Furthermore, this is not a case in which Surprenant simply advances a
Chapter 93A claim based on an alleged violation of HAMP guidelines (like many other plaintiffs
pursuing such claims in federal court arising from efforts to modify their mortgages).  Cf.
Okoye, 2011 WL 3269686, at *7-*9 (discussing such claims and the three-pronged analysis
courts in this District have applied thereto).  Rather, Surprenant's claim turns on a lengthy course
of conduct by PNC, which Surprenant argues constitutes one overarching unfair or deceptive
practice.

acting reasonably under the circumstances, to act differently from the way they otherwise would have acted.'" Okoye v. Bank of N.Y. Mellon, No. 10-11563, 2011 WL 3269686, at *6 (D. Mass. July 28, 2011) (quoting Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 488 (Mass. 2004)). Because Chapter 93A "'creates new substantive rights and, in particular cases, makes conduct unlawful which was not unlawful under the common law or any prior statute,'" a plaintiff need not establish a statutory violation as an element of proving a Chapter 93A claim. Young, 717 F.3d at 240 (quoting Commonwealth v. Fremont Inv. & Loan, 897 N.E.2d 548, 556 (Mass. 2008)).

Whether conduct amounts to a violation of Chapter 93A depends on the nature, purpose, and effect of the conduct and is a fact-intensive and case-specific inquiry. See Okoye, 2011 WL 3269686, at *6. On several occasions over the past few years, courts in this jurisdiction have concluded that unfair conduct by a loan servicer in the context of loan modification negotiations may, under the appropriate circumstances, rise to the level of a Chapter 93A violation. See, e.g., Young, 717 F.3d at 241-42; Okoye, 2011 WL 3269686, at *9, *11; Morris v. BAC Home Loans Servicing, L.P., 775 F. Supp. 2d 255, 259 (D. Mass. 2011).[19]

Surprenant's Chapter 93A claim encompasses conduct by PNC spanning a period of more than two years when his series of modification applications were pending; it "includes [PNC's] handling of h[is] entire case," beginning with his initial HAMP application in 2009 and continuing through his attempts to secure a permanent loan modification in 2012. Young, 717 F.3d at 240. Surprenant has provided evidence from which a reasonable factfinder could

---

[19]Although these cases arise in the context of motions to dismiss, the same reasoning regarding the sorts of conduct that could, if proven, establish a Chapter 93A violation applies here.

conclude that PNC engaged in "a pattern of misrepresentations, failure to correct detrimental errors, and/or dilatory conduct . . . that . . . could amount to unfair or deceptive practices." Okoye, 2011 WL 3269686, at *9.  This course of conduct included:

- Taking apparently inconsistent positions about the impact of an active bankruptcy proceeding on a defaulting borrower's eligibility for a loan modification.  See Doc. No. 73-6 at 2 (stating in a letter that HAMP modifications required bankruptcy court approval, implying such modifications were possible); Doc. No. 48-6 (stating that Surprenant was ineligible for a HAMP modification because of his pending bankruptcy); Doc. No. 73-5 at 3 (same); Doc. No. 73-11 at 4 (stating individuals in bankruptcy could obtain modifications after having their mortgages reaffirmed); Doc. Nos. 73-12, 73-13, 73-14 (reflecting an instance in which another individual with an active bankruptcy proceeding obtained a modification from PNC with court permission, but without having her mortgage reaffirmed).

- Twice securing Surprenant's agreement to proposed payment and modification terms (or ranges of terms), leading him to believe approval of a permanent loan modification was imminent in April 2010, and then changing course to require a new HAMP application instead.  Doc. No. 66 at ¶¶ 53-57, 78, 86-89, 95; Doc. No. 73-17 at 23-24.

- Embarking on a serial application process lasting more than a year and a half, throughout which Surprenant repeatedly was required to submit financial information which was often identical to information he already had provided, see generally Doc. No. 73-17 (reflecting numerous submissions of HAMP applications and workout packages, and repeated requests for P&Ls, tax returns, rental income documentation, and hardship

letters), and which resulted in eight separate denials for different reasons.[20]

- Issuing three consecutive denials for insufficient income based on calculations of Surprenant's monthly income that disregarded information about his salary and income taxes that he previously had provided and specifically had explained on more than one occasion, as reflected in PNC's own notes related to Surprenant's loan.  See Doc. No. 73-17 at 25; Doc. No. 73-28.

- Denying one of Surprenant's modification requests due to tax liens that had existed – and about which PNC had been aware – for more than a year at the time of the relevant denial, without previously informing Surprenant that such liens would impede his modification request.  See Doc. No. 73-17 at 12-13, 25.

- Failing to provide a written copy of the TPP documents until one day before Surprenant was required to sign and return them, and even then failing to provide a legible copy thereof.  Doc. No. 66 at ¶ 45.

- Failing to provide any notice about the terms of the permanent loan modification offer until the Friday before Memorial Day weekend in 2012, only one week before Surprenant was required to sign and return the document, despite requests by Surprenant for

_____

[20]The ever-changing reasons were: ineligibility due to bankruptcy in 2009; the need to apply through HAMP instead of through other workout programs in May 2010; excessive forbearance in June 2010; insufficient income in October and November 2010 and March 2011; the need to resolve a tax lien in April 2011; and a determination in October 2011 that Surprenant's monthly payments already were low enough (i.e., that Surprenant made **too much** money).  See Doc. Nos. 48-6, 48-10, 48-13; Doc. No. 66 at ¶¶ 24, 26, 28, 38, 95.  The differing reasons – and the inconsistent methods used to calculate Surprenant's income, as reflected in PNC's own loan file – are particularly troubling in light of the fact that Surprenant's P&L statements throughout the entire modification process reflected relatively consistent monthly incomes, at least insofar as Surprenant's $5,400-per-month salary is concerned.  See, e.g., Doc. No. 73-25; Doc. No. 73-26 at 3; Doc. No. 73-28; Doc. No. 73-32; Doc. No. 73-40.

information about the modification terms at an earlier date.  Id. at ¶ 48.

•      Sending foreclosure sale notices to Surprenant after he had accepted the TPP, and

requiring him to pursue court action in order to secure a stay of the sale.  Id. at ¶¶ 45, 51.

Such actions also might be viewed as "withholding and changing information, providing

pretextual reasons for denying modification, and making misleading statements regarding the

process and the state of the loan," which could support a Chapter 93A claim stemming from bad

faith negotiation of a loan modification.  See Okoye, 2011 WL 3269686, at *11 (noting there is

no general duty to negotiate a loan modification, but finding that where a lender undertakes such

negotiations it must do so in good faith).  This pattern of behavior by PNC, if accepted by a

factfinder at trial, falls "within the penumbra of . . . [an] established concept of unfairness" for

purposes of Chapter 93A.  See Linkage Corp., 679 N.E.2d at 209.

To be sure, PNC might ultimately have reasonable, legitimate explanations of each of its

numerous representations and actions cited by Surprenant in support of his Chapter 93A claim.

The evaluation of such explanations, however, presents a question of fact for trial, especially

where, as here, no such explanations appear in the summary judgment record or are based upon

undisputed facts.  For example, PNC seeks to explain its shifting statements regarding the

significance of Surprenant's pending bankruptcy proceedings by asserting a change in governing

regulations.  See Doc. No. 75 at 4 n.5.  But PNC fails to identify the relevant regulations, submit

copies thereof, or advance undisputed factual evidence sufficient to warrant a legal conclusion

that its differing statements on the subject arose from differing controlling law at the relevant

times.

Surprenant also has adduced evidence which, if credited, shows "substantial harm" that

24

has accrued as a result of PNC's allegedly unfair and dilatory conduct.  For example, his expert's

report notes that the principal balance on his mortgage was $336,021 in early 2010, near the

beginning of his modification application process, but had risen to $399,538 by the time his loan

was permanently modified in 2012.  Doc. No. 73-39 at 2.  This increase came after PNC

instructed Surprenant not to make further payments without a formal payment arrangement, and

his arrears continued to accrue during the pendency of his various modification applications.

See Doc. No. 66 at ¶ 81; see also Doc. No. 73-17 at 12 (instructing Surprenant to use a large

lump sum to pay off tax liens rather than to reduce his arrears on his mortgage).  Surprenant's

expert also noted Surprenant suffered "miscellaneous monetary harm caused by dismissing [his]

bankruptcy, . . . increased interest on student loans and the future cost of credit due to the two

year continued negative mortgage delinquency reporting," and a reduced credit score.  Doc. No.

73-39 at 4.

Given the saga of the loan modification here – and especially where Surprenant

repeatedly submitted information reflecting that his financial position remained substantially

unchanged during the relevant time period, see note 20, supra – a jury reasonably could conclude

that PNC strung Surprenant along in an unfair, unethical, or unscrupulous way, resulting in a

significant increase in his mortgage balance.  Under these circumstances, Surprenant has

adduced sufficient evidence to raise a genuine issue of material fact as to whether PNC's

conduct rose to the level of a Chapter 93A violation, warranting a trial with respect to Count IV

in his complaint.

IV.    CONCLUSION

For the foregoing reasons, I respectfully recommend the Court ALLOW PNC's motion

25

(Doc. No. 45) in part and DENY it in part.[21]  Specifically, I recommend that the Court enter

judgment in PNC's favor with respect to the first three claims in Surprenant's complaint, deny

summary judgment with respect to Surprenant's Chapter 93A claim, and schedule a pretrial

conference.


   /s/ Leo T. Sorokin
Leo T. Sorokin
Chief U.S. Magistrate Judge

---

[21]The Parties are hereby advised that any party who objects to these proposed findings
and recommendations must file a written objection thereto within fourteen days of receipt of this
Report and Recommendation.  The written objections must identify with specificity the portion
of the proposed findings, recommendations, or report to which objection is made, and the basis
for such objections.  See Fed. R. Civ. P. 72; 28 U.S.C. § 636(b).  The parties are further advised
that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to
comply with Rule 72(b) will preclude further appellate review of the District Court's order based
on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d
271 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Scott v.
Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st
Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); see also
Thomas v. Arn, 474 U.S. 140 (1985).